**AMES INVESTMENT, INC., Plaintiff,**

v.

**UNITED STATES OF AMERICA and Revenue Officer Michael E. Rogala, Defendants.**

No. 90–72501.

United States District Court, E.D. Michigan, S.D.

April 21, 1993.

**MEMORANDUM OPINION AND ORDER**

ANNA DIGGS TAYLOR, District Judge.

This Memorandum Opinion constitutes the findings of fact and conclusions of law of the Court, after trial to the bench. Plaintiff, Ames Investment, brought this lawsuit against Defendants, the Internal Revenue Service ("IRS") and IRS Revenue Officer Michael E. Rogala, alleging that the Defendants wrongfully seized Plaintiff's real property to satisfy the tax debt of one of its shareholders. Further, Plaintiff claims that Defendant Michael Rogala failed to comply with 26 U.S.C. § 6331(d), requiring a notice of seizure thirty days before a levy is executed.

Defendant has responded that the Plaintiff corporation held title to the property in question only as an alter ego or nominee of William Johnson ("the taxpayer"), and that the IRS issued its Notice of Levy and seized the property to satisfy the tax liability of Mr. Johnson, an officer, director and shareholder of Plaintiff corporation. The property in question, a residence located at 18410 Marlowe, Detroit, Michigan was purchased in 1969, two weeks after the corporation was formed.

This Court has conducted a bench trial as to whether the IRS levy against the Marlowe property was wrongful and whether Revenue Officer Michael E. Rogala complied with IRS rules and regulations in recommending and facilitating the levy.

At the close of the evidence, this Court dismissed Plaintiff's claim against Defendant Revenue Officer Rogala for failure to present any evidence of his having made a wrongful levy as a matter of personal vendetta, as claimed, or for any reason other than performance of official duty. Moreover, according to Rogala's testimony, it is evident that he complied with IRS rules and regulations, particularly 26 U.S.C. § 6331(d). Finally, Plaintiff waived the invalid service issue, once it became clear that Revenue Officer Rogala attempted to serve the Plaintiff on several occasions personally, and finally by certified mail.

Mindy L. Hitchcock, Detroit, MI, for plaintiff.

Keith V. Morgan, U.S. Dept. of Justice, Washington, DC, for defendants.

The Court finds, additionally, that it must dismiss Plaintiff's claim against the United States for wrongful levy. Plaintiff has failed to demonstrate by a preponderance of the evidence that the levy was wrongfully executed. Moreover, the great weight of evidence supports the government's claim that Ames Investment, Inc. was utilized as the alter ego of the taxpayer for the purpose of providing tax free income in the form of a personal residence and use of vehicles.

Ames Investment is a Michigan corporation incorporated on March 25, 1969. The taxpayer William Johnson, his wife Barbara Johnson and James Brown (the real estate agent through whom the residence was purchased) were its original officers, directors and shareholders. Upon Barbara Johnson's death in 1969, her twenty shares were divided equally between her two daughters, Cherie Johnson and Charlotte Johnson. James Brown subsequently transferred five of his shares to real estate broker Laverne C. Miller who became an officer, director and shareholder of the Plaintiff corporation in lieu of commission when he acted as agent for its purchase of another property. Finally, William Johnson later transferred five of his shares to Mr. Jesse Lamb for a similar consideration.

Two weeks after its formation Ames Investment purchased the subject property by warranty deed from Seymour and Ruth Wayne for $35,000. According to the trial testimony of shareholders William Johnson and James Brown, Ames Investment is in the business of purchasing and managing rental property. Ames' officers, Johnson and Brown, further testified that the Marlowe residence is the only residence owned by Ames Investment that has never been leased, even though the officers conceded that the Marlowe residence, in which the taxpayer and/or his children resided at all times pertinent hereto, was its most valuable asset. It was never leased, according to the testimony, because no offer of sufficient rental was ever received.

In addition to the Marlowe residence, Ames Investment owned property located at 18063 through 18067 James Couzens, 18071 through 18079 James Couzens, 2433 Pasadena, and 2255 Tyler, all located within Detroit, Michigan. Messrs. Johnson and Brown further testified that the Marlowe residence was originally intended to be Ames Investment's corporate headquarters. According to Brown, after the Plaintiff corporation moved its corporate headquarters to 18079 James Couzens, the Marlowe residence continued to be used by the company for business-related social functions, even though Johnson testified that Ames had no clients.

On August 17, 1990, the IRS issued a Notice of Seizure on 18410 Marlowe alleging that the Plaintiff corporation, Ames Investment, was the nominee of the taxpayer, William Johnson, because of his use of the said real property as a personal residence. The Marlowe residence was levied upon to satisfy the tax liability of William Johnson, who is indebted to the United States for $93,487.11 in income taxes for the years 1982 to 1984. On August 20, 1990, the Plaintiff Corporation, Ames Investment, Inc., brought the present action under 26 U.S.C. § 7426 alleging wrongful levy.

At trial, the government presented cogent and credible testimony concerning the unity of interest between Ames Investment and William Johnson, as evidenced by the latter's use of the Marlowe property as a family residence since the date of its purchase. Moreover, the testimony of Ames Investment's own officers similarly revealed that Ames Investment was indeed the alter ego of the taxpayer William Johnson. Specifically, the evidence was that William Johnson had given 18410 Marlowe as his personal residence on his tax returns as well as on various State court probation documents. As probation involves distinct monitoring requirements, Johnson's report of the Marlowe address for probation purposes suggests that Marlowe was indeed his true residence.

Additionally, the government introduced testimony that Johnson paid the monthly utility bills and, although Johnson denied that the gas and water utility accounts were in his name, he admitted that the telephone and the electric bills were in his name and that he regularly paid all of the utility bills.

Moreover, taxpayer Johnson testified that the Marlowe residence was used as a home for his young children, and that his sister also lived there and cared for the children. Throughout the bench trial, however, Johnson denied that he, himself, had ever lived at the Marlowe residence and repeatedly stated that he maintained his own residence at 3307 Carter. He offered documents such as his driver's license and voter registration forms to support his contention that 3307 Carter was his permanent address. Johnson did admit, nevertheless, that he stayed at Marlowe on occasion with the family members described above.

Johnson also stated that Marvin Gaye, his dear friend, and other close friends had stayed there for periods of time as his guests. Revenue Officer Rogala testified that Johnson told him during an interview that he lived in the Marlowe house rent-free. Johnson testified that he was *non compos mentis*, essentially, at the time of the interview because of the medications he had been prescribed.

In addition to the Marlowe residence, taxpayer Johnson testified that Ames had purchased several vehicles, including a Jeep and a Cadillac, which he used to collect rent and run errands for the corporation. However, it is clear that the automobiles were for Johnson's personal use as he owned no other vehicle. Other Ames officers testified that they had their own cars and did not use the company's cars.

Taxpayer Johnson also testified that he had failed to file his tax returns from 1982 to 1984 because the medication which he had been prescribed from 1975 to 1989 for malignant hypertension had totally compromised his thinking and memory. This testimony was not credible. Johnson also testified incredibly that, other than a brief stint in the armed forces, he had done nothing to earn a living, throughout his life. He also refused to disclose the sources of his income, $52,000 in 1983 and $47,000 in 1984. Moreover, Johnson testified that he earned nothing from his investment in the Plaintiff corporation, even though Ames was, supposedly, an income-earning venture formed to return profits on real estate investments. His testimony was incredible and self-contradictory, throughout the proceedings.

James Brown and L. Charles Miller, whom Johnson had given shares in Ames in lieu of commissions for purchasing corporate real estate, were also incredible in their testimony concerning their knowledge of William Johnson's use of the subject property. Both Brown and Miller testified that to the best of their knowledge no one had ever lived in the Marlowe residence. However, Johnson had stated he and Brown had discussed the arrangement whereby Johnson's relatives would live in the Marlowe residence. They also stated that the Marlowe residence was Ames' most valuable asset, worth between six and eight hundred dollars ($600 and $800) monthly in rent; although it had never been either rented or sold and that fact had never been of interest to them.

Ames Investment's officers further testified, incredibly, that the corporation had never earned more income than necessary to pay the expenses incurred by Johnson's management activities, and had never paid any salary, dividends, or any form of compensation to any shareholder. Each of them had putatively placed funds into the corporation, Brown investing one-third of $35,000 and Miller contributing his commission on corporate real estate sales to Ames. However, it appears that none of the three investors, with the exception of Johnson who was using the subject property as his residence, was concerned that the corporation generate any income whatsoever.

Finally, Vasel E. Glass, the accountant for Ames Investment, testified that he prepared the Plaintiff corporation's corporate tax returns from raw data in the form of check stubs and receipts supplied by the taxpayer. According to Glass, the Plaintiff corporation maintained no corporate ledgers or books. He further testified that Ames Investment had never showed a profit for the time he filed its tax returns. Glass also testified, significantly, that he had only filed delinquent corporate tax returns last year, while the instant litigation was ongoing.

This Court's jurisdiction rests on 28 U.S.C. § 1346(e), which provides that the district

courts shall have original jurisdiction over cases brought against the United States pursuant to 26 U.S.C. § 7426 of the Internal Revenue Code.

 Plaintiff's sole remedy for the alleged wrongful levy by the United States is under 26 U.S.C. § 7426, which allows a civil action to be brought against the United States by a person or entity other than the delinquent taxpayer.[1] To support a § 7426 action, a Plaintiff corporation has the initial burden of showing that it had some interest in the subject property and that the government wrongfully executed a levy against the property because of the tax assessment of another. *Morris v. United States Department of Treasury, I.R.S.*, 813 F.2d 343, 345 (11th Cir.1987); *William L. Comer Family Equity Trust v. United States*, 732 F.Supp. 755, 759 (E.D.Mich.1990). After Plaintiff makes this initial showing, the burden then shifts to the government to establish a nexus between the taxpayer and the property levied upon. *Morris, supra* at 345. Thus, in assessing Plaintiff's challenge to the levy pursuant to 26 U.S.C. § 7426, this Court must determine whether the entity bringing the action owns the subject property, or whether it is owned by the taxpayer in question. *Shannon v. United States*, 521 F.2d 56 (9th Cir.1975), *cert. denied*, 424 U.S. 965, 96 S.Ct. 1458, 47 L.Ed.2d 731 (1976); *William L. Comer Family Equity Trust v. United States*, 732 F.Supp. 755, 758 (E.D.Mich.1990).

 In assessing the validity of Plaintiff's § 7426 claim, this Court must determine whether Ames Investment is the alter ego of the taxpayer as the government claims or, in the alternative, whether Plaintiff, an otherwise valid corporation, holds the Marlowe property as taxpayer's nominee. To determine whether the Plaintiff corporation is merely an alter ego of the taxpayer with respect to the subject property, the Court is to evaluate the following:

(1) the treatment by the taxpayers of the plaintiff's assets as their own; (2) the control of the plaintiff by the taxpayers and their family alone; (3) the use of plaintiff's funds to pay the taxpayers' personal expenses; (4) transference of property from the taxpayers to the plaintiff for little or no consideration; and (5) the fact that the plaintiff fully supported the taxpayers in the style of their choosing.

*William L. Comer Family Trust, supra* at 759, *citing Loving Saviour Church v. United States*, 728 F.2d 1085 (8th Cir.1984).

In the case at bar, the relationship between the Plaintiff corporation and the taxpayer utilizing its property indeed meet the foregoing standards supporting an alter ego theory. At trial, the taxpayer William Johnson testified to his personal use of the Marlowe residence as a home for his children, his sister, and on some occasions, himself. Moreover, the government introduced evidence indicating that Johnson reported the Marlowe residence as his permanent residence on a number of official documents and paid the expenses of maintaining the residence.

All three Ames officers testified that the Marlowe residence was Ames' most valuable asset. Given that Ames has never been able to pay its shareholders any return, Johnson's personal use of the Marlowe residence, at significant financial loss, for at least fifteen years, calls the legitimacy of Ames as an independent corporate entity into serious question. Ultimately, Johnson's personal use of the Marlowe residence created an alter ego relationship between him and Ames Investment. Although the corporation has maintained its formal status with the State of Michigan, the officers disagreed as to whether it had ever held a formal meeting and what its capitalization had been.

When an alter ego relationship is established between a Plaintiff corporation and a taxpayer, the corporate entity may be disregarded for debt liability purposes. According to Michigan state law, "[w]here [a] corporation is a mere agent or instrumentality of its shareholders or a device to avoid legal obligations, the corporate entity may be ignored." *Kline v. Kline*, 104 Mich.App. 700,

---

1. 26 U.S.C. § 7426 provides in its pertinent part: "[i]f a levy has been made on property ..., any person ... who claims an interest in or lien on such property ... may bring a civil action against the United States."

702, 305 N.W.2d 297 (1981), *citing People ex rel. Attorney General v. Michigan Bell Telephone Co.*, 246 Mich. 198, 205, 224 N.W. 438 (1929). Moreover, this Court's analysis of whether the corporate form should be disregarded is especially fact-driven, as "[e]ach case involving disregard of the corporate entity rests on its own special facts." *Kline, supra* 104 Mich.App. at 703, 305 N.W.2d 297, *citing Brown Brothers Equipment Co. v. State Highway Comm.*, 51 Mich.App. 448, 452, 215 N.W.2d 591 (1974); *see also Solomon v. Western Hills Development Company (After Remand)*, 110 Mich.App. 257, 263, 312 N.W.2d 428 (1981).

The Sixth Circuit in *Laborers' Pension Trust v. Weinberger Homes, Inc.*, 872 F.2d 702, 704–705 (6th Cir.1988) articulated some of the factors considered in disregarding the corporate form including:

(1) the amount of respect given to the separate entity of the corporation by its shareholders; (2) the degree of injustice visited on the litigants by recognition of the corporate entity; and (3) the fraudulent intent of the incorporators. [ ]. Factors to be considered include undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham. *Id.* at 704–705.

Moreover, adopting Michigan state law interpretation, the Sixth Circuit elaborated on the above factors in *Bodenhamer Building Corp., v. Architectural Research Corp.*, 873 F.2d 109, 112 (6th Cir.1989), which provides that the corporate veil may be pierced when:

(a) a corporation and shareholders have complete identity of interests; (b) the corporation is a mere instrumentality of the shareholders; (c) the corporation is a device to avoid a legal obligation; or (d) the corporation is used to defeat public convenience, justify a wrong, protect fraud or defend a crime. *Id.* at 112, *citing Kline v. Kline*, 104 Mich.App. 700, 702–703, 305 N.W.2d 297 (1981); *Williams v. American Title Co.*, 83 Mich.App. 686, 697–699, 269 N.W.2d 481 (1978).

The above factors are not exhaustive, but rather are considerations which a court must take into account in assessing whether a corporate entity may be disregarded for debt liability. *See Bodenhamer Building Corp., v. Architectural Research Corp.*, 873 F.2d 109, 111 (6th Cir.1989), *quoting Klager v. Robert Meyer Co.*, 415 Mich. 402, 411–412, 329 N.W.2d 721, 725 (1982). Ultimately, "[e]ach case must be decided on its own facts." *Bodenhamer, supra* at 111–12, *citing Lettinga v. Agristor Credit Corp.*, 686 F.2d 442, 446 (6th Cir.1982).

In the case at bar, the evidence clearly supports the conclusion that the corporate veil of the Plaintiff corporation may be pierced. The corporation appears to have been a sham. The taxpayer's personal use of its property created an alter ego relationship whereby Johnson applied Ames Investment's assets to his personal benefit and no other. Although Ames Investment may have observed some corporate formalities, the credible evidence of record supports the determination that the taxpayer was using the Plaintiff corporation's assets for his own personal benefit, as an alter ego.

In consideration of all of the factors relevant in the instant case, the great weight of the credible evidence compels a finding that Ames Investment, as an alter ego of taxpayer Johnson, held the Marlowe residence only for Johnson's personal use. The government, therefore, has established a nexus between the taxpayer William Johnson and the subject property levied upon. Given the alter ego relationship between the Plaintiff corporation and the taxpayer, justifying a piercing of the corporate veil, Plaintiff cannot support its § 7426 claim.

Accordingly, the Plaintiff corporation's claim under § 7426 is DISMISSED, as the government has sufficiently established a nexus between the taxpayer and the subject property justifying the levy in question.

### *JUDGMENT*

This matter having come before the Court, and the Court having entered its Memorandum Order and Opinion. Now, therefore,

IT IS ORDERED THAT THE above-styled case is DISMISSED.

IT IS SO ORDERED.